AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

<table>
<tr><td>LODGED<br>CLERK, U.S. DISTRICT COURT<br><br>08/02/2023<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___ AP ___ DEPUTY</td></tr>
</table>

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

8/3/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ KC ___ DEPUTY

| UNITED STATES OF AMERICA, | |
|---|---|
| v. | |
| ADRIAN ESPINO LOPEZ,<br>   aka "Adrian Espino-Lopez," and<br>   aka "Adrian Lopez" | Case No.  5:23-mj-00379 |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 9, 2023, in the county of Riverside in the Central District of California, the

defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 922(g)(1) | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
ATF Special Agent, Dylan Kirker
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   _____August 3, 2023_____           _____
                                                                         *Judge's signature*

City and state:   _____Riverside, California_____        Honorable Sheri Pym, U.S. Magistrate Judge
                                                                         *Printed name and title*

AUSA: Cory Burleson (951-276-6945)

## AFFIDAVIT

I, Dylan Kirker, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Adrian Espino Lopez ("LOPEZ"), aka "Adrian Espino-Lopez" and "Adrian Lopez," for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 50 Grams of Methamphetamine, and a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

2.   This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), which is in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in Riverside, California, as described more fully in Attachment A: a black and blue, prepaid AT&T cell phone, found on LOPEZ's person on May 9, 2023.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm or ammunition) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a Special Agent ("SA") with ATF and have been so employed since October 2020.  I am currently assigned to the ATF Field Office in Riverside, California.  I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training Program.  As an SA, I have received training in federal firearms and narcotics laws and regulations.  I regularly refer to these laws and regulations during my duties, and I have experience investigating these crimes.  I am also familiar with how digital devices are used to facilitate and conceal firearms and drug trafficking.

6.    Before joining ATF, I was employed as a Border Patrol Agent with the United States Border Patrol for three years.  As a Border Patrol Agent, I received training in laws that combat illegal immigration, human trafficking, and narcotics trafficking, and I gained experience investigating those crimes.

I also received a Bachelor of Arts degree in Business
Administration from the University of Maine at Presque Isle.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    LOPEZ is a convicted felon, currently on California
state parole until approximately January 18, 2025.

8.    On May 9, 2023, officers assigned to the Central Post-
Release Accountability and Compliance Team ("PACT")[1] conducted a
parole search at LOPEZ's residence located at 30572 Orangetree
Way, Murrieta, California 92563, a single-family residence where
LOPEZ lived with his wife, his mother-in-law, and a juvenile
female.  When PACT officers knocked and announced at the front
door, LOPEZ exited the back door where he was detained by other
officers.  Officers searched LOPEZ's person and found $10,000 in
United States currency (all in $100 bills), a lanyard of keys,
and the SUBJECT DEVICE.

9.    PACT officers then conducted a parole search of
LOPEZ's residence and the Chevrolet Impala parked in his
driveway--the key for which was found on LOPEZ's lanyard of
keys.  Inside the home, officers found an additional $2,385 in
various denominations of United States currency in LOPEZ's
wallet inside his bedroom.  Inside the Impala, officers found
men's clothing and cigarettes.  Inside the trunk of the Impala,

---

[1] PACT is a joint task force composed of officers from local
police departments and Riverside County Sheriff's Department.
Among other things, PACT conducts parole compliance searches on
current parolees to ensure parolees are complying with their
parole terms.  PACT focuses on "high-risk" or "at-large"
parolees, Post-release Community Supervision offenders, and
those on mandatory supervision from county jail who they believe
pose the greatest risk to public safety.

officers found approximately two pounds of methamphetamine (later determined by a lab to be 890 grams of actual methamphetamine) in two one-gallon sized Ziplock bags, a Polymer 80 ("ghost gun") loaded with eight rounds of 9mm ammunition, and 47 additional rounds of ammunition.

10.  While LOPEZ's wife is the registered owner of the Impala, LOPEZ's wife and mother-in-law told officers that LOPEZ drives the Impala.  LOPEZ's wife also confirmed that the clothes and cigarettes found in the Impala belonged to LOPEZ.

### IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Parole Search**

12.  LOPEZ is currently on parole with the California Department of Corrections and Rehabilitation for robbery, possession of a controlled substance inside a jail/prison, and possession of a controlled substance for sale.  His term of parole is currently set to expire on January 18, 2025.

13.  On May 9, 2023, members of PACT went to LOPEZ's residence in Murrieta, California, to conduct a parole search pursuant to LOPEZ's parole terms.[2]  Before arriving at the

---

[2] I obtained a copy of LOPEZ's parole terms, and they specify that "[y]ou, your residence, and any property under your control are subject to search or seizure by a probation officer, an agent or officer of the California Department of Corrections and Rehabilitation, or any other peace officers, at any time of the day or night, with or without a search warrant, with or without cause."

residence, Murrieta Police Department Officer David Irving (a
PACT member) confirmed that LOPEZ was on parole, and he
confirmed LOPEZ's parole address as 30572 Orangetree Way,
Murrieta, California 92563.

**B.    Search of LOPEZ**

14.    After arriving at LOPEZ's residence, Officer Irving
knocked on the front door and pressed the button on the Ring
camera next to the front door.  No one immediately answered the
front door, but LOPEZ ran out the back door where he was
detained by officers.

15.    Officers searched LOPEZ's person and found $10,000 in
United States currency in one hundred $100 dollar bills, a
lanyard of keys that included a key to the light blue Chevrolet
Impala parked in LOPEZ's driveway,[3] and the SUBJECT DEVICE.

16.    Two other individuals were inside the residence:
LOPEZ's mother-in-law and a 17-year-old female.

**C.    Search of the Chevrolet Impala**

17.    After detaining LOPEZ, PACT team members searched the
Impala in LOPEZ's driveway pursuant to LOPEZ's parole search
terms.  One of the keys on the lanyard found in LOPEZ's pocket
opened the Impala, and officers saw men's clothing in the front
seat.  In addition to the men's clothing, officers also found
cigarettes in the Impala's front seat, and LOPEZ's mother-in-law
told officers that the Impala was LOPEZ's car.

---

[3] A Cadillac Escalade key was also found on the lanyard in
LOPEZ's pocket.  LOPEZ' wife drove up in a Cadillac Escalade
while PACT members were searching the residence, and LOPEZ and
his wife said that the Escalade was his wife's car.

18.   Using one of the keys found on LOPEZ, officers opened the trunk of the Impala.  Inside the trunk, Officer Irving saw a shopping bag with two, one-gallon sized baggies that contained a large quantity of a white crystalline substance.  Officer Irving suspected the white crystalline substance was methamphetamine.

19.   Inside the same shopping bag under the two gallon-sized baggies, Officer Irving found a black semi-automatic handgun.  The gun did not have a serial number and "POLYMER 80" is inscribed on the side of the pistol grip.[4]  The gun was loaded with eight rounds of 9mm ammunition.

20.   Inside the same shopping bag under the loaded gun and other items, Officer Irving found another plastic bag that contained 47 rounds of additional 9mm ammunition.

**D.   Search of the Residence**

21.   PACT members also conducted a search of LOPEZ's residence pursuant to LOPEZ's parole search terms.  Officers were assisted by a narcotics canine, trained to detect the odor of narcotics.

22.   While searching the residence, officers did not find any controlled substances, guns, or ammunition.  However, the narcotics canine did "alert" to multiple locations inside LOPEZ's bedroom and closet.[5]

---

[4] A Polymer 80 is commonly referred to as a "ghost gun."  A "ghost gun" is an un-serialized firearm that is untraceable.  "Ghost guns" can be bought as a kit an assembled at home.

[5] According to PACT officers, they identified the master bedroom as LOPEZ's bedroom because LOPEZ's wallet was found in a bag on top of the bed inside the room, there was a photograph of
*(footnote cont'd on next page)*

23.   Inside LOPEZ's bedroom, officers found LOPEZ's wallet inside a bag on top of the bed.  LOPEZ's wallet contained a total of $2,385 in United States currency, including 17 $100s, 8 $50s, 12 $20s, 3 $5s, and 30 $1s.

**E.    Interview of Santa Luz Pena**

24.   While at LOPEZ's residence, a PACT team member interviewed LOPEZ's mother-in-law, Santa Luz Pena.  The interview was conducted in Spanish and was not recorded.  During the interview, Santa Luz Pena said that the Impala parked in the driveway belonged to LOPEZ.

**F.    Interview of Maira Pena**

25.   LOPEZ's wife, Maira Pena arrived at the house while PACT team members were searching the residence.  Pena, who works as a pharmacy technician, told officers that she saw them on the Ring camera, and that she came home from work to see what was going on.  During her interview, which was conducted in English and captured on body-worn camera, Pena told officers the following:

a.    Pena is the registered owner of the Impala, but LOPEZ drives the vehicle.

b.    Pena bought the Impala while LOPEZ was incarcerated, and thus, she registered the Impala in her name.

c.    Pena does not smoke, and the cigarettes in the Impala belong the LOPEZ.

---

LOPEZ on the nightstand, and there was adult men's clothing and shoes in the master bedroom closet.

        d.   Pena and LOPEZ had an argument the day before the search.  LOPEZ put his clothes inside the Impala and told Pena that he was leaving.

        e.   The men's clothing inside the Impala belong to LOPEZ.

        f.   Pena and LOPEZ got married in January 2023 after LOPEZ was released from prison.

        g.   Pena and Lopez moved to Murrieta so that LOPEZ would be away from his life of crime in San Diego.

        h.   Pena was not aware of the narcotics, gun, or ammunition found in the trunk of the Impala.

        i.   Pena has never seen LOPEZ with a gun.

        j.   Pena and LOPEZ started a dog breeding business, Real One Bullies LLC.[6]

        k.   LOPEZ managed the dogs and would make approximately $2,000 each time he would breed a dog.

        l.   In April 2023, Pena and LOPEZ opened a business bank account at Bank of America.

        m.   Pena believed that the business account had approximately $6,000.[7]  Pena estimated that they had $10,000 to $15,000 in cash at the residence.

---

[6] According to documents obtained from the California Secretary of State website, Real One Bullies LLC was organized on March 30, 2023, and Pena and LOPEZ are the LLC's only two members.

[7] According to bank records, Pena withdrew $6,400 from the business account--leaving a balance of $0.00--less than two hours before she spoke with officers at the residence.

n.   A truck that LOPEZ drives was in an accident in San Diego the day before the search and no longer drivable. They withdrew cash from the business account to purchase another car.

**G.   Interview of LOPEZ**

26.   After PACT members completed their search, LOPEZ was transferred to the Murrieta Police Department.  Officer Irving read LOPEZ his Miranda rights from a department issued notepad. LOPEZ said that he understood his rights and was willing to speak.  LOPEZ told Officer Irving that the Impala belongs to his wife and that he does not drive it.  Lopez also said that he was planning to use the $10,000 on him to buy a car.  When asked if the narcotics, gun, and ammunition found in the Impala belonged to his wife, LOPEZ said that he did not say that.  LOPEZ then asked for an attorney, and the interview ended.

**H.   Search of the SUBJECT DEVICE**

27.   Following LOPEZ's arrest, pursuant to California Penal Code § 1546.1(c)(9), Officer Irving searched the SUBJECT DEVICE. According to his written report and photographs he took of the device, Officer Irving found only four pictures on the SUBJECT DEVICE, and it appeared that some of the applications had not been previously opened.  The SUBJECT DEVICE had outgoing calls and a few text messages, but it appeared to Officer Irving that some text messages had been deleted.  During his search of the SUBJECT DEVICE, Officer Irving did not locate evidence

indicative of drug sales or possession of weapons.[8]

**I.    LOPEZ's Criminal History**

28.  On July 5, 2023, I reviewed certified conviction documents for LOPEZ and learned that LOPEZ has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about December 17, 2008, a violation of California Penal Code § 211, Robbery, taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear, in the Superior Court for the State of California, County of San Diego, case number SCD214544.

29.  On July 5, 2023, I reviewed LOPEZ's criminal history via a law enforcement database and learned that LOPEZ has previously been convicted of at least the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about September 27, 2016, a violation of California Health and Safety Code § 11351, Possession of a Controlled Substance for Sale, in the Superior Court for the State of California, County of Kern, case number DF012000A;

b.    On or about March 5, 2018, a violation of California Penal Code § 4573.6, Possession of a Controlled

---

[8] Although Officer Irving did not find evidence of drug sales or possession of weapons on the SUBJECT DEVICE, based on my training and experience, there is probable cause to believe that evidence of the Subject Offenses will be found on the SUBJECT DEVICE.  As further detailed in Section VII below, forensic examination of digital devices can recover deleted and hidden data, as well as location data.

Substance in Prison, in the Superior Court for the State of California, County of Kern, case number DF013088B;

        c.    On or about March 5, 2018, a violation of California Penal Code § 4573.6, Possession of Drugs/Alcohol in Prison/Jail, in the Superior Court for the State of California, County of Kern, case number DF013088.

### J.    DEA Lab Results Regarding Suspected Methamphetamine

30.    The two packages of suspected methamphetamine found in the Impala were sent to a Drug Enforcement Administration ("DEA") lab for analysis.  According to a DEA lab report, dated July 6, 2023, one of the packages of suspected methamphetamine contained 445 grams of actual methamphetamine.  According to a DEA lab report, dated July 10, 2023, the second package of suspected methamphetamine contained 445 grams of actual methamphetamine.

### K.    Interstate Nexus Regarding the Ammunition

31.    On July 5, 2023, ATF Interstate Nexus Expert SA Monica Lozano examined the 55 rounds of 9mm ammunition and confirmed that all of the ammunition was manufactured outside of the State of California.  Because the ammunition was manufactured outside of California and found in California, SA Lozano believes that the ammunition traveled in and affected interstate commerce.

### V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES

32.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

  d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

  e.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

33.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

  a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[9]

34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

_____

[9] As used herein, the term "digital device" includes the SUBJECT DEVICE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

///

///

## VIII.    <u>CONCLUSION</u>

36.  For all of the reasons described above, there is probable cause to believe that LOPEZ has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 50 Grams of Methamphetamine, and a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone  in  this  3rd day  of
August,
2023.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE